Tom Wheeler (CA Bar #304191)
Environmental Protection Information Center
145 G Street #A
Arcata, California 95521
tom@wildcalifornia.org
Ph: (707) 822-7711
Fax: (707) 822-7712

*Counsel for Plaintiff Environmental Protection Information Center*

Susan Jane M. Brown, *pro hac vice*
Western Environmental Law Center
4107 N.E. Couch St.
Portland, Oregon 97232
brown@westernlaw.org
Ph: (503) 914-1323
Fax: (541) 485-2457

Peter M.K. Frost, *pro hac vice*
Western Environmental Law Center
1216 Lincoln Street
Eugene, Oregon 97401
frost@westernlaw.org
Ph: (541) 359-3238
Fax: (541) 485-2457

*Counsel for Plaintiffs Karuk Tribe, Klamath Riverkeeper, Klamath-Siskiyou Wildlands Center and Center for Biological Diversity*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| KARUK TRIBE et al. | ) | Case No. 3:16-cv-01079-MMC |
| | ) | |
| Plaintiffs, | ) | **PLAINTIFFS' MOTION FOR A** |
| | ) | **TEMPORARY RESTRAINING** |
| v. | ) | **ORDER** |
| | ) | |
| WILLIAM STELLE et al., | ) | |
| | ) | Date and Time: To be set by Court |
| Defendants. | ) | Courtroom 7, 19th Floor |
| _____ | ) | Hon. Maxine M. Chesney |

# TABLE OF CONTENTS

I.      Standard of Review.................................................................................. 2

II.     Factual Background.................................................................................. 4

III.    Legal Background..................................................................................... 5

IV.     The Tribe Raises Serious Questions and Is Likely to Prevail on the Merits.............. 6

        A.      The Westside Project Violates NFMA By Authorizing Logging in LSRs. ...... 6

        B.      The Westside Project Violates NFMA By Failing to Adequately Protect All
                Riparian Reserves................................................................................. 12

        C.      The Westside Project Relies on an Unlawful BiOp and Violates the ESA. ... 14

                1.      The BiOp Lacks a Rational Connection Between Facts Found and the
                        Conclusion Made...................................................................... 16

                2.      Project Mitigation is Uncertain, Speculative, and Unenforceable. ..... 19

V.      The Tribe is Entitled to a TRO.................................................................... 21

        A.      The Tribe Will Suffer Immediate and Irreparable Injury. .......................... 21

        B.      The Balance of Equities Tips Strongly in Favor of the Tribe....................... 24

        C.      The Court Should Not Require a Bond in this Case..................................... 25

# TABLE OF AUTHORITIES

## FEDERAL CASES

*All. For The Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ............................... 3, 21, 25

*Bennett v. Spear*, 520 U.S. 154 (1997) ................................................................................... 2

*Blue Mts. Biodiversity Project v. Blackwood*, 161 F.3d 1208 (9th Cir. 1998) ......................... 2, 9

*Cal. ex rel. Lockyer v. USDA*, 575 F.3d 999 (9th Cir. 2009) ......................................................... 5

*California ex rel. Van de Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319
    (9th Cir. 1985) ...................................................................................................... 25

*Ctr. for Biological Diversity v. Fish & Wildlife Serv.*, No. C-08-1278 EMC, 2011 WL 6813200
    (N.D. Cal. Dec. 28, 2011) .............................................................................. 21

*Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893 (9th Cir. 2012) ......................................... 5

*Defenders of Wildlife v. Bernal*, 204 F.3d 920 (9th Cir. 1999) .................................................. 21

*Earth Island Inst. v. Mosbacher*, 746 F. Supp. 964 (N.D. Cal. 1990) ........................................ 21

*Forest Conserv. Council v. Rosboro Lumber Co.*, 50 F.3d 781 (9th Cir. 1995) ......................... 21

*Forest Service Employees for Envtl. Ethics v. Forest Service*, 2005 WL 1514071 (N.D. Cal.
    June 27, 2005) ..................................................................................................... 9

*Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin.*, 99 F. Supp. 3d
    1033 (N.D. Cal. 2015) ............................................................................ 3, 19, 20

*L.A. Mem'l Coliseum Com. v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980) ...... 25

*League of Wilderness Defenders v. U.S. Forest Serv.*, 549 F.3d 1211 (9th Cir. 2008) ................. 2

*Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953 (9th Cir. 2005) ........................... 9

*Nat'l Wildlife Fed. v. Nat'l Marine Fisheries Svc.*, 524 F.3d 917, 924 (9th Cir. 2008) ............... 5

*Nat'l Wildlife Fed'n v. Burlington N.R.R.*, 23 F.3d 1508 (9th Cir. 1994) .................................... 21

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782 (9th Cir. 2005) .............. 3, 24

*Nw. Envtl. Def. Ctr. v. U.S. Army Corps of Eng'rs*, 817 F. Supp. 2d 1290 (D. Or. 2011) .......... 24

*Or. Nat. Res. Council Fund v. Brong*, 492 F.3d 1120 (9th Cir. 2007) ................................ passim

*Or. Nat. Res. Council Fund v. Goodman*, 505 F.3d 884 (9th Cir. 2007) .................................... 12

*Pac. Coast Fed. of Fishermen's Assn. v. Bureau of Reclamation*, 426 F.3d 1082, 1094 (9th Cir.
    2005) ..................................................................................................................... 20

*Pac. Rivers Council v. Thomas*, 30 F.3d 1050 (9th Cir. 1994) .................................................... 21

*Portland Audubon Soc'y v. Lujan*, 795 F. Supp. 1489 (D. Or. 1992) ......................................... 21

*Tenn. Valley Auth. v. Hill*, 437 U.S. 153 (1978) ................................................................... 3, 24

*Wash. Toxics Coal. v. EPA*, 413 F.3d 1024 (9th Cir. 2005) ................................................... 3, 24

*Wild Fish Conservancy v. Salazar*, 628 F.3d 513 (9th Cir. 2010) ................................. 5, 17, 18

*Winter v. NRDC, Inc.*, 555 U.S. 7 (2008) ..................................................................................... 3

## FEDERAL STATUTES

5 U.S.C. § 706(2)(A) ................................................................................................ passim

16 U.S.C. § 1604(a) ........................................................................................................ 6

16 U.S.C. § 1604(i) ......................................................................................................... 6

## FEDERAL REGULATIONS

36 C.F.R. § 219.10(e) (1982) ......................................................................................... 6

50 C.F.R. § 402.14(h)(2) ................................................................................................ 5

50 C.F.R. § 402.14(i) ...................................................................................................... 5

## MISCELLANEOUS

62 Fed. Reg. 24,586 (May 6, 1997) ............................................................................. 14

62 Fed. Reg. 24,588 ...................................................................................................... 14

Plaintiffs Karuk Tribe et al. ("Tribe") hereby respectfully file this motion for a temporary restraining order ("TRO"), seeking to preserve the status quo in their challenge to the Westside Fire Recovery Project on the Klamath National Forest in northern California, pending the Court's resolution of their claims. LR 65-1. Counsel for the Tribe has conferred repeatedly with counsel for Defendants to try to obviate the need to file for a TRO. *See*, First Declaration of Thomas Wheeler. On April 15, 2016, counsel for Defendants informed counsel for the Tribe that logging operations may begin as soon as Wednesday, April 20, 2016. *Id*. Because the parties' attempts to resolve this dispute before logging and other disputed project activities begin were unsuccessful, on the same day, counsel for the Tribe notified counsel for Defendants that it would file this motion. *Id*. Defendants have notice of it. LR 65-1(b).

This case involves two sets of federal agency defendants. The first is the National Marine Fisheries Service ("NMFS"), which wrote a Biological Opinion ("BiOp") and Incidental Take Statement under the Endangered Species Act ("ESA") to assess the effects of the project on ESA-listed coho salmon. The second is the Forest Service, which authorized the Westside Project under the National Forest Management Act ("NFMA"). The Tribe seeks a TRO enjoining all Defendants and their agents from commencing or continuing post-fire logging, roadbuilding, road reconstruction, and log landing site construction in the planning area. The Tribe does *not* seek to enjoin roadside hazard tree removal along roads for the purpose of public health and safety, which is the only arguable exigency for any project work at this time.

The Westside Project is an enormous post-fire salvage project in the Klamath Mountains in northern California involving many thousands of acres of logging. The Project is wholly within the Tribe's ancestral lands and waters. The Project involves clear cut logging of large diameter snags in Late Successional Reserves ("LSRs"), which the Ninth Circuit has repeated held to be unlawful under the Northwest Forest Plan ("NFP"), which was promulgated under NFMA. The Project will log occupied habitat for the northern spotted owl, a species listed under the ESA as threatened with extinction; at least 103 owls may be incidentally taken by the Project. Further, the Project will build roads and log landing slides on steep slopes above streams that provide habitat for coho salmon, an ESA-listed species that is at "high risk of extinction" in the

1   area. Given the geomorphology of the Klamath Mountains, and the instability created by recent

2   fires, these slopes are already highly prone to landslides and slope failures, and any slides in

3   these watersheds will have "catastrophic" effects. Indeed, the NFP requires the Forest Service to

4   designate steep and unstable areas as "Riparian Reserves" and to protect them from entry; but it

5   unlawfully did not so do here.

6        Logging operations on Forest Service lands in the Klamath Mountains usually begin in

7   late May or at late as early July, when higher elevation ground conditions are dry, and most

8   wildlife have fledged. Wheeler Dec. ¶13. Here, the Forest Service wants to implement the

9   Project as soon as possible to recover the economic value of burned timber, so it waived "wet

10  season" requirements while, at the same time, it and NMFS have violated NFMA and the ESA.

11       The Karuk Tribe emphasizes that this motion is necessarily hurried. Simultaneous with

12  this motion, the Tribe submits a Proposed Order that if adopted would complete briefing on a

13  preliminary relief by May 30, 2016, which would allow the Project to be implemented if the

14  Court denies the motion. Nor has the Tribe had the chance to fully review the Administrative

15  Records ("AR") that underlie the two federal agencies' decisions related to the Westside Project.

16  *Cf*. ECF #35 (allowing filing of ARs on disc).[1]

**POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR A TRO.**

17

18  **I.**   **Standard of Review.**

19       The Court reviews the legality of the Forest Service's actions under NFMA, and the

20  sufficiency of NMFS's actions under the ESA, under the "arbitrary and capricious" standard of

21  the Administrative Procedure Act ("APA"). *Blue Mountains Biodiversity Project v. Blackwood*,

22  161 F.3d 1208, 1211 (9th Cir. 1998) (NFMA), *Bennett v. Spear*, 520 U.S. 154, 178 (1997)

23  (ESA). Review under this APA standard is narrow, and the court may not substitute its judgment

24  for that of the agency. *League of Wilderness Defenders v. U.S. Forest Service*, 549 F.3d 1211,

25  1215 (9th Cir. 2008). "Despite this narrow scope of review, the court's inquiry must be

26

27  _____

28  [1]   In this motion, the Tribe cites to the Forest Service AR because it is complete and contains the NMFS BiOp challenged here. If the Court wishes to review any cited document, the Tribe will electronically file excerpts, and serve hard copies the same day.

'searching and careful.'" *Klamath-Siskiyou Wildlands v. Nat. Oceanic*, 99 F. Supp. 3d 1033, 1016 (N.D. Cal. 2015) (quoting *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378, 109 S. Ct. 1851, 104 L. Ed. 2d 377 (1989). "Ultimately, 'the agency must articulate a rational connection between the facts found and the conclusions made.'" *Id.* (citation omitted).

A plaintiff seeking a TRO "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). In cases brought under the ESA, among these factors, Congress has already determined that the balance of equities and public interest favor an injunction. *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 194 (1978) ("Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities"). As the Ninth Circuit explained, "Congress has decided that under the ESA, the balance of hardships always tips sharply in favor of the endangered or threatened species." *Wash. Toxics Coal. v. EPA*, 413 F.3d 1024, 1035 (9th Cir. 2005); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 793-94 (9th Cir. 2005) ("[i]n cases involving the ESA, Congress removed from the courts their traditional equitable discretion in injunction proceedings of balancing the parties' competing interests").

Additionally, courts may apply a "sliding scale" to consider the success and harm factors. *All. For The Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011) (continuing to apply the sliding scale approach after *Winter*). Accordingly, the elements of the preliminary relief test are balanced; a stronger showing of one element may offset a weaker showing of another: a stronger showing of irreparable harm to plaintiff might offset a lesser showing of likelihood of success on the merits. *Id.* at 1131. The Tribe, therefore, need raise only "serious questions going to the merits," if it can demonstrate that the balance of hardships tips sharply in their favor and that the other *Winter* factors have been met. *Id.* at 1135 ("the 'serious questions' approach survives *Winter* when applied as part of the four-element *Winter* test").

1   **II.     Factual Background**.

2          In the summer of 2014, three geographically distinct fire complexes, the Happy Camp

3   Complex, the Whites Fire, and the Beaver Fires, burned across approximately 215,000 acres in

4   the Klamath River watershed. AR A-70. In response, the Forest Service proposed the Westside

5   Project. The Forest Service prepared an Environmental Impact Statement ("EIS") under the

6   National Environmental Policy Act ("NEPA") to evaluate the Project. AR A-68. The Karuk

7   Tribe commented on the draft EIS, and proposed to the Forest Service an alternative to its

8   proposed action that would allow some commercial logging in the area, but would be more

9   restorative of forests and of slopes above streams, in order to protect coho salmon, northern

10  spotted owls, and other resources. AR A-1370-1374. The Forest Service rejected the Tribe's

11  proposal and issued a Record of Decision ("ROD") that includes different features, but the most

12  controversial—and the heart of this suit—is the clear cut "salvage" logging of 5,760 acres of

13  forests located in old growth reserves that was affected by the 2014 wildfires, in some of the

14  most steep and wild mountains on the West Coast. To facilitate logging, the Project authorizes

15  building, rebuilding, or reopening of approximately 12.7 miles of temporary or decommissioned

16  roads, and the building of 75 new landing sites for helicopters to facilitate tree removal.

17         These activities pose enormous ecological risks to coho salmon, the northern spotted owl,

18  and other forest resources. Because of the Project's impacts, the Forest Service consulted with

19  NMFS and the U.S. Fish and Wildlife Service under Section 7 of the ESA. On January 15, 2016,

20  NMFS issued a Biological Opinion ("BiOp") for the Project. Shortly thereafter, the Forest

21  Service published its Record of Decision ("ROD") for the Project. On March 3rd 2016, the Tribe

22  filed this lawsuit to challenge the BiOp. ECF #1. On March 15, 2016, the Tribe amended its

23  complaint to challenge the ROD. ECF #14. Subsequently, the Forest Service has sold two timber

24  sales that are part of the Project: the Slinkard and Walker Creek timber sales, and absent a TRO,

25  the companies that bought those timber sales are expected to immediately begin operations,

26  including felling trees, likely this Wednesday, April 20th 2016. Wheeler Dec.¶6.

27

28

1  **III.    Legal Background.**

2       The ESA is "'the most comprehensive legislation for the preservation of endangered

3  species ever enacted by any nation'" and "reflects 'a conscious decision by Congress to give

4  endangered species priority over the 'primary missions' of federal agencies.'" *Cal. ex rel*

5  *Lockyer v. United States Dep't of Agric.*, 575 F.3d 999, 1018 (9th Cir. 2009) (quoting *Tenn.*

6  *Valley Auth. v. Hill*, 437 U.S. 153, 180, 185 (1978). The ESA contains substantive and

7  procedural requirements. Procedurally, ESA Section 7 requires a federal agency to consult with

8  the respective Service if its proposed action "may affect" a listed species or its critical habitat. 16

9  U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a). Formal consultation results in a BiOp that

10 determines whether the action is likely to jeopardize the continued existence of a listed species or

11 adversely modify its critical habitat. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h).

12 Substantively, ESA Section 9 establishes "a blanket prohibition" on any entity from causing

13 "take," *Or. Natural Res. Council v. Allen*, 476 F.3d 1031, 1033 (9th Cir. 2007), which includes

14 "harm" to a listed species resulting from "habitat modification." *Marbled Murrelet v. Babbitt*, 83

15 F.3d 1060, 1067 (9th Cir. 1996) (citing 50 C.F.R. § 17.3).

16      A BiOp must include "a detailed discussion of the effects of the action on the listed

17 species or critical habitat." 50 C.F.R. § 402.14(h)(2). To make its jeopardy determination, NMFS

18 must evaluate "'the current status of the listed species or critical habitat,' the 'effects of the

19 action,' and 'cumulative effects.'" *Nat'l Wildlife Fed. v. Nat'l Marine Fisheries Svc.*, 524 F.3d

20 917, 924 (9th Cir. 2008) (citing 50 C.F.R. § 402.14(g)(2)-(3)). In doing so, NMFS must "use the

21 best information available." *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 525 (9th Cir.

22 2010). If NMFS "concludes that the action is not likely to jeopardize the species, but is likely to

23 result in some take," it must provide an Incidental Take Statement ("ITS") along with the BiOp.

24 *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 909 (9th Cir. 2012) (citing 50 C.F.R. §

25 402.14(i)). Among other things, an ITS must specify "the impact, *i.e.*, the amount or extent, of

26 such incidental taking on the species[.]" 50 C.F.R. § 402.14(i). "Take that complies with the

27 terms and conditions of an ITS is not a prohibited take under Section 9." *Salazar*, 695 F.3d at

28 909 (citations omitted).

In turn, the National Forest Management Act ("NFMA") requires the Forest Service to develop comprehensive land and resource management plans ("LRMPs") for each unit of the National Forest System. 16 U.S.C. § 1604(a). Subsequent "plans, permits, contracts, and other instruments for the use and occupancy" of the national forests must be consistent with the local LRMP, in this case, the Klamath National Forest Land and Resource Management Plan, as amended by the NFP. 16 U.S.C. § 1604(i); 36 C.F.R. § 219.10(e) (1982). In 1994, the Bureau of Land Management ("BLM") and the Forest Service issued the NFP, which amended all LRMPs within the range of the northern spotted owl.

Late-Successional Reserves ("LSRs") are land use allocations under the NFP where the primary objective is to protect and enhance the conditions of old-growth forests that serve as habitat for the northern spotted owl and other late-successional habitat-associated species by creating a network of large "reserves" or blocks of habitat. AR H-1423. The NFP permits some logging in LSRs, but restricts the timing, location, type, and amount of salvage logging that may occur. The lands affected by the Westside Project lie largely within two Klamath LSRs: the Seiad LSR and Eddy Gulch LSR.

Riparian Reserves are another land allocation under the NFP; they cover "portions of watersheds where riparian-dependent resources receive primary emphasis and where special standards and guidelines apply." AR H-1382. The NFP requires "unstable and potentially unstable areas (including earthflows)" to be designated as Riparian Reserves, and to protect these areas from disturbance. AR H-1384. Salvage logging is proposed within approximately 2,500 acres of these Riparian Reserves, which the Forest Service calls "geologic Riparian Reserves" in the Westside FEIS. AR A-1739.

**IV.    The Tribe Raises Serious Questions and Is Likely to Prevail on the Merits.**

**A.    The Westside Project Violates NFMA By Authorizing Logging in LSRs.**

Ninth Circuit precedent establishes that the Project violates the NFP by removing large diameter snags from two LSRs within the project area: the Seiad and Eddy Gulch LSRs. In *Oregon Nat. Res. Council Fund v. Brong*, 492 F.3d 1120 (9th Cir. 2007), which is nearly identical to this case, the Ninth Circuit examined whether the Bureau of Land Management

("BLM") violated the NFP by a proposing to cut and remove large diameter snags likely to persist from 961 acres within an LSR in the Timbered Rock post-fire project. The Ninth Circuit explained that the NFP's "management directives for specified reserve areas give priority to environmental concerns." *Id.* at 1125-26. It stated that "LSRs lie at the heart of the NFP's ecosystem-based conservation strategy for the northern spotted owl and other endangered species." *Id.* at 1127.

The Ninth Circuit held that the Timbered Rock project violated the NFP in several respects. First, it noted that "[g]iven the importance of snags in late-successional ecosystems, it is not surprising the NFP restricts removal of snags in LSRs...In fact, the NFP's salvage guideline no. 3 expressly limits the removal of such snags." *Brong*, 492 F.3d at 1128 (citing NFP S&G C-14 "following stand-replacing disturbance, management should focus on retaining snags that are likely to persist until late-successional conditions have developed and the new stand is again producing large snags. Late-successional conditions are not associated with stands less than 80 years old"). Despite the plain language of the NFP, "the BLM asserts that the Project, which entails the removal of a significant number of large snags in late-successional areas, is nonetheless consistent with the NFP" because the BLM proposed to retain *some* snags likely to persist within harvest areas, but also pushed those retained snags to the edge of harvest units such that "over two-thirds of the affected acreage will be *completely* stripped of all salvageable trees." *Id.* at 1128, 1130 (emphases in original).

The Ninth Circuit rejected BLM's "some is enough" standard of retention of large diameter snags likely to persist: importantly, "the BLM can point to no part of the NFP to support its argument that using the some-is-enough standard satisfies the Plan." *Id.* at 1129. Indeed, as the Ninth Circuit noted, that is because no such standard exists in the NFP. *Id.* at 1128. BLM's argument also failed because "the amount of large snag retention the BLM claims to be "enough" to satisfy the NFP is only achieved by averaging salvaged and non-salvaged areas together across *all* the acres included in the logging." *Id.* As the Ninth Circuit explained, "if using such an approach was permitted, the Project could clear-cut all 1,004 acres and still claim to be retaining eight to twelve snags per acre by merely expanding the Project to "include"

more land. Clearly, this would be unreasonable, as any adverse environmental effect could be "diluted to insignificance." *Id*. at 1130 (footnotes omitted) (observing that "the BLM's attempt to dilute the effects of its proposed activities by averaging the snag retention over such a wide area is inconsistent with the NFP and improper under our precedent. *See Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1035–37 (9th Cir. 2001) (holding that an agency cannot try to "minimize" the environmental impact of an activity by simply adopting a scale of analysis so broad that it marginalizes the site-level impact of the activity on ecosystem health)").

Despite this precedent, in the Westside Project, the Forest Service authorized large diameter snag removal from the Seiad and Eddy Gulch LSRs. AR A-216-217. As was true in *Brong*, the NFP requires salvage logging within LSRs to be consistent with LSR Objectives. AR H-1428. One key LSR Objective is the "development of old-growth forest characteristics including snags."[2] AR H-1375. As the NFP explains: "Diseased and damaged trees and logs are key structural components of late-successional and old-growth forests. Salvage of dead trees affects the development of future stands and habitat quality for a number of organisms." AR H-1378. The Westside Project purports to remove only these critical old-growth forest features from the planning area; green trees will not be removed. AR H-1378.

In order to encourage the development of old-growth forest characteristics including snags, the NFP provides that following stand replacing events such as wildfire, the Forest Service should "focus on retaining snags that are likely to persist until late-successional conditions have developed and the new stand is again producing large snags." AR H-1418, A-967 (Spotted owl "Recovery Action 12 speaks directly to the need for post-fire silvicultural treatments should focus on conserving and restoring habitat elements that take a long time to develop (e.g. large trees, medium, and large snags, down wood)". The FEIS notes that snags larger than 14 inches in diameter at breast height ("DBH") are likely to persist until late-successional conditions have developed and the new stand is again producing large snags. AR A-

---

[2]   Snags are standing dead trees. AR A-1907.

235, A-800, A-222, A-911, A-1449. Thus, the Project proposes to remove the very snags that are likely to persist until the next stand is again producing large snags.

Moreover, most of the snags the Forest Service *are* retaining are not actually located within harvest units, the exact same situation at issue in *Brong*. 492 F.3d at 1130 ("Justice Brandeis creatively captured the illogic of this approach: "I abhor averages....A man may have six meals one day and none the next, making an average of three meals per day, but that is not a good way to live") (internal citations omitted). For example, the FEIS states that "Units are larger than potential treatment areas because they include salvage harvest acres plus areas where no harvest will occur. These include hydrologic riparian reserves, areas with less than 50 percent mortality within unit boundaries, and additional snag retention areas." AR A-1282. With this approach, the Forest Service has drawn harvest unit boundaries larger than the footprint of the harvested acres, such that the unharvested areas will be where snags, if any, will be retained. AR A-1285, A-1446, A-1395 ("generally, the largest trees occur within hydrologic Riparian Reserves, which are retained"), A-1010 ("In units less than 100 acres snag retention will only occur in Riparian Reserves and where legacy components occur"). Moreover, FEIS Table G-6 very clearly shows that numerous harvest units have *zero* acres of snag retention at all. AR A-316-317 (right hand column "sum of retention (acres)").

The problem with averaging snag retention across large areas, or pushing retention areas to the edge of logged units (and therefore contiguous with unharvested areas), is that harvest units themselves may be devoid of large snags altogether, which will not provide for wildlife needs within logged areas. AR A-1282, A-1285, A-1446, A-1395, A-316-317. The Ninth Circuit emphatically rejected this approach in *Brong,* 492 F.3d at 1129-30, and other courts have too. *Forest Service Employees for Envtl. Ethics v. Forest Service*, 2005 WL 1514071 (N.D. Cal. June 27, 2005) (same); *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 961-64 (9th Cir. 2005); *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1213 (9th Cir. 1998).

The Tribe expects the Forest Service will attempt to characterize this argument, as they did in *Brong*, that Plaintiffs seek to retain *all* snags likely to persist until the next stand is again

developing late-successional characteristics. Plaintiffs do not assert that *all* snags likely to persist must be retained but, instead, that the NFP requires the Forest Service to demonstrate that salvage logging "focus[es] on retaining snags that are likely to persist until late successional conditions have developed and the new stand is again producing large snags," in about 80 years. Given that many harvest units will have no snags retained, AR A-316-317, and other units will only have snags retained in areas not subject to harvest such as hydrologic Riparian Reserves or in areas adjacent to but outside of harvest units, AR A-1282, A-1285, A-1446, A-1395, A-316-317, the Forest Service has not "focused on retaining" snags likely to persist and instead is removing them through logging.[3] AR A-1400 (portraying the harvest prescription as only removing "some" large snags, as many more will be retained in areas not subject to harvest), A-1408, A-1418, A-1037, A-229.

Also when considering post-fire logging in LSRs, the NFP provides that "while priority should be given to salvage in areas where it will have a positive effect on late-successional forest habitat, salvage operations should not diminish habitat suitability now or in the future." AR H-1417. The FEIS acknowledges that old growth-associated species such as spotted owls, fisher, marten, and several species of cavity excavators (woodpeckers) depend on large diameter snags for suitable habitat and survival, and that their numbers and habitat will decline with the implementation of the project. For example, the FEIS states that "salvage harvest and hazard tree removal will remove many of the snags that would provide for future stand development." AR A-377. The FEIS explains that "any change in habitat will likely diminish the possibility of reproduction...this will likely result in these activity centers having difficulty providing sufficient resources for reproduction as a result" of the Project. AR A-1524. Salvage harvest will also negatively affect designated critical habitat for spotted owls by removing through logging "primary constituent elements" of such habitat: in this case, nesting, roosting, and foraging habitat that contains large diameter trees and high amounts of dead wood on the forest floor "that will be both removed and degraded by proposed activities." AR A-376-377. Moreover, "salvage

---

[3]   For example, the Forest Service could have proposed a project, much like the Karuk Tribe proposed, that would have removed smaller diameter snags that contribute to fire hazard.

1   harvest may affect the future development of the stand by removing the large snags that would

2   fall and become large downed logs." AR A-382, A-1495, A-1503 ("The lack of treatment will

3   retain all the remaining habitat and important legacy structures to aid in the development of owl

4   habitat by providing physical structure as the stand regenerates. Since northern spotted owls and

5   their prey rely on these structures to fulfill their needs for survival and reproduction, the

6   maintenance of large trees and large woody debris will increase the quality of future owl

7   habitat").

8        The FEIS states that the project is "likely to adversely affect" at least 47 northern spotted

9   owl pairs and their progeny in a myriad of ways, including through habitat loss, noise

10  harassment, helicopter disturbance, and cumulative effects from past projects. AR A-357-364

11  (Tables G-18 and G-19). According to the Fish and Wildlife Service, the project will result in the

12  incidental take of 103 northern spotted owls due to significant disruptions of owl behavior "to an

13  extent that causes injury or death." AR F-213. "Overall, 18% of all activity centers on the west

14  side of the KNF will be adversely affected by the proposed activities." AR A-367. There can be

15  no rational disagreement that the Westside Project will reduce habitat suitability now and in the

16  future for northern spotted owl.

17       But spotted owls are not the only species that will be adversely affected by a decrease in

18  habitat suitability now and in the future. The FEIS explains that the project will reduce "habitat

19  connectivity from 'moderate' to 'low,'" AR A-1526, "within 14 of the 36 watersheds analyzed"

20  for fisher, marten, and wolverine, which are late-successional and old growth forest-associated

21  species. AR A-1531, A-1480.[4] Regarding snag-associated species in particular, the Project will

22  affect 19,873 acres of snag habitat, which is 14% of these species' habitat in the planning area.

23  AR A-1528. Habitat suitability will be diminished post-harvest, as well as into the future, for

24  these species as well, which violates the NFP.

25       Finally, The NFP states that in LSRs, "salvage will not be driven by economic…factors."

26  The NFP states that "salvage will not be driven by economic or timber sale program factors."

27

28  [4] The NFP also requires the Forest Service to "Maintain and restore spatial and temporal connectivity within and between watersheds." AR H-1381.

*Oregon Nat. Res. Council Fund v. Brong*, No. CIV.04-693-AA, 2004 WL 2554575, at *8 (D. Or. Nov. 8, 2004), *aff'd*, 492 F.3d 1120 (9th Cir. 2007) (citing NFP Appendix F, F-21). However, one of the principle purpose and need of the Project is economic recovery of the burned timber. AR A-1247 (there is a "need for a project that is economically viable"), A-1265 ("Capturing the maximum economic value of the salvaged timber also benefits Siskiyou County"), A-1389 (alternative rejected because it "does not meet another part of the purpose and need of the project which is to obtain the maximum economic commodity and value from burned timber"), A-1284 ("Areas proposed for salvage harvest treatment include...Areas determined to be feasible in terms of...economics"), A-1299 (units were dropped if they were not economically viable), A-1311 (same), A-1316 (same). Given that it is clear that the NFP did not intend for salvage logging in an LSR to occur for economic recovery, but that this is the driving purpose of the Westside Project, the decision to implement the project is arbitrary, capricious, and not in accordance with NFMA. 5 U.S.C. § 706(2)(A).

Removing large diameter, economically valuable snags from the Seiad and Eddy Gulch LSRs is inconsistent with the LSR objective of developing of snags, does not "focus on retaining snags likely to persist until the next stand develops," and "diminishes habitat suitability now or in the future." Consequently, the Westside Project is in contravention to the requirements of the NFP and Klamath LRMP, and is arbitrary and capricious. 5 U.S.C. § 706(2)(A).

**B.     The Westside Project Violates NFMA By Failing to Adequately Protect All Riparian Reserves.**

The NFP requires the Forest Service to designate "unstable and potentially unstable" areas as Riparian Reserves. AR H-1435. These areas must be afforded a buffer equivalent to "the extent of unstable and potentially unstable areas (including earthflows)." *Id*. The NFP significantly constrains the types of activities that may occur within Riparian Reserves, including timber harvest, road construction, and fuel reduction work. AR H-1435("prohibit timber harvest...in Riparian Reserves"), H-1435-1442; *Oregon Nat. Res. Council Fund v. Goodman*, 505 F.3d 884, 894-95 (9th Cir. 2007) (requiring the Forest Service to designate Riparian Reserves around "potentially unstable" lands).

Despite this clear direction, or perhaps because of it, the Forest Service labeled steep and unstable areas in the Westside planning area "geologic Riparian Reserves," as distinct from hydrologic Riparian Reserves adjacent to flowing bodies of water, in order to sanction ground-based salvage logging. The FEIS states that "There is salvage harvest in unstable lands, *which are Riparian Reserves*, but salvage harvest in these areas still excludes hydrologic Riparian Reserves and inner gorges." AR A-1872 (emphasis added), A-1853. Overall, "there are about 2,500 acres of salvage harvest proposed on unstable lands as defined by the Forest Plan and considered to be Riparian Reserves." AR A-1739.[5] In addition, "There are three temporary access road are proposed that will likely be built directly on ultramafic bedrock," a very unstable landform in the planning area. AR A-1735, A-1737 (same). Many of these unstable areas are located in Walker Creek and Grider Creek watersheds: "Watersheds with a very high landslide risk have a high potential of landsliding that may affect human life and safety. These watersheds are Lower Grider and Walker Creek." AR A-1737.

The Forest Service appears to justify logging, roading, and helicopter landing[6] construction in geologic Riparian Reserves "because these areas will benefit from hazardous fuels reduction and site preparation and planting in that risk of future high-severity wildfire will be reduced. Additionally, the areas will become re-forested more quickly (due to planting) thereby lowering the risk of sediment production from surface erosion and mass wasting processes." AR A-1122. However, not only does the plain language of the NFP restrict entry into Riparian Reserves, but also a second provision of the NFP prohibits relying on these activities to justify entry into Riparian Reserves:[7] the NFP commands "do not use mitigation or planned restoration as a substitute for preventing habitat degradation." AR H-1441 (WR-3).

---

[5]   The FEIS did not analyze the selected alternative, Alternative 3 Modified. This citation is to the analysis conducted for Alternative 3, which is similar.

[6]   Landings are cleared areas in the forest to which logs are yarded or skidded for loading onto trucks for transport.

[7]   Moreover, the Forest Service acknowledges that it does not have adequate funding to pay for fuel reduction and replanting. See infra Section IV.C.2.

Equally important, courts have already rejected the Forest Service's failure to designate, buffer, and prevent activity within Riparian Reserves. In the district court case affirmed on appeal in *Brong*, the court held that not only are Riparian Reserves required around unstable areas, but also rejected the argument that entry into these unstable areas was permissible because they were unlikely to contribute sediment or down wood to streams. *Oregon Nat. Res. Council Fund v. Brong*, 2004 WL 2554575, at *11 (D. Or. Nov. 8, 2004), *aff'd*, 492 F.3d 1120 (9th Cir. 2007) (observing that "the BLM's opinion that no sediment or CWD will reach the stream from these 92 acres (and thus render it unnecessary to designate the land as Riparian Reserves) is immaterial. The Standards and Guidelines do not use "material delivery to streams" as a criterion for whether land is appropriately designated as Riparian Reserves. Instead, the S&Gs clearly state that the designation must be made on all 'unstable and potentially unstable areas'"); *see also, Goodman*, 505 F.3d at 894-95 (same). The Forest Service's failure to properly designate and protect geologic Riparian Reserves as Riparian Reserves as required by the NFP and the Klamath LRMP is arbitrary, capricious, and not in accordance with NFMA.

## C.   The Westside Project Relies on an Unlawful BiOp and Violates the ESA.

Coho salmon, an anadromous fish that generally exhibits a relatively simply three-year life cycle, inhabit the Project area. AR F-1294. Juveniles require a complex stream morphology of pools, riffles, and backwaters created by downed trees in the stream channel, and well-oxygenated water free of suspended sediments or other pollutants. 62 Fed. Reg. 24586, 24593 (May 6, 1997). After juveniles have reared in freshwater, in the spring, "smolts" migrate to the ocean. *Id.* at 24588. In the last century, indigenous, naturally-producing populations of coho have been extirpated from nearly all tributaries in the Columbia River basin, and they are in significant decline in coastal streams throughout Washington, Oregon, and California. 62 Fed. Reg. 24588. The coho in this case are categorized as the Southern Oregon/Northern California Coast ("SONCC") Evolutionary Significant Unit ("ESU") of coho. *Id.*

In 1997, NMFS listed the SONCC coho ESU as threatened with extinction under the ESA due to extreme population losses, largely as a result of logging and roadbuilding. 62 Fed. Reg. 24,588 *et seq*. (finding a decline from  150,000 to 400,000 naturally-spawning fish to

approximately 10,000 naturally producing adults), 24,592. Related to logging, NMFS noted: "Timber harvest activities can result in sediment delivered to streams through mass wasting and surface erosion that can elevate the level of fine sediments in spawing gravels and fill the interstices inhabited by invertebrates." *Id.* at 24,593. In 2016, NMFS noted that "the best available data indicated" that the SONCC coho ESU is "at high risk of extinction." *Id.*

The NMFS BiOp for the Westside Project noted the project area includes 105.2 miles of designated critical habitat for SONCC coho, AR F-1310-12, and that the Project will adversely affect the Upper Klamath River coho population. AR F-1358. The Upper Klamath population is "a core, functionally independent population" that historically "had a high likelihood of persisting in isolation over 100-year time scales." AR F-1316. "Besides its role in achieving demographic goals and objectives for recovery" of the SONCC coho ESU as a whole, "as a core population the Upper Klamath population may serve as a source of spawner strays for nearby populations." *Id.* The "Upper Klamath River tributaries, refugia and mainstem habitat function as migratory and rearing habitat for fish from populations located upstream (i.e., Scott and Shasta). Therefore, restoration of the Upper Klamath River is important for recovery of these populations, too." *Id.*

To contribute to the recovery of the SONCC coho ESU, the Upper Klamath River population "needs to have at least 8,500 spawners." AR F-1316. Currently, however, the population "is at high risk of extinction given its low population size and negative population growth rate." AR F-1315. Data on run size are lacking (for example, ten years ago, one study estimated the "population to be between 100 and 4000 adults," *id.*), but even the highest end of that estimate places run size "far lower than needed for the population to achieve a low extinction risk." *Id.*

1.     **The BiOp Lacks a Rational Connection Between Facts Found and the Conclusion Made.**

The 2014 fires changed the landscape where the project will occur, in part by killing trees and other native vegetation with roots that provided soil support. AR F-1329, F-1334.[8] As a result, the fires increased the risks of landslides and slope failures even above the natural risks inherent in the geomorphology of the Klamath Mountains. AR F-1335, F-1309. The BiOp states that the Project will even further increase the risks of landslides and slope failures, beyond those caused by the fires. AR F-1345. The BiOp fails to consider these heightened project-caused risks in the context of the watersheds where coho find spawning and rearing habitat, where the most risky project activities are scheduled to occur, and where any landslide or slope failure would cause catastrophic effects to coho.

The BiOp states that because of the Project, "[t]he likelihood of a landslide or slope failure at the site scale will be temporarily increased where temporary road activities and/or new landing construction occur." AR F-1345. The BiOp states that the project poses the highest risks to coho in the Walker Creek and Grider Creek watersheds: "Walker Creek and Grider Creek represent tributaries that are important for non-natal rearing of juvenile coho salmon, and to a lesser extent spawning and rearing of natal fish." AR F-1358, F-1315.[9] The BiOp includes a table that lists for each watershed the "Consequence of Landslide Event," the "Current Landslide Likelihood," and the "Current Landslide Risk." AR F-1408-09.

For the Walker Creek watershed, the BiOp states that the current landslide likelihood is "Almost Certain," the current risk is "Very High," and the consequence of a landslide is "Catastrophic." AR F-1408. For the Upper Grider Creek watershed, the current landslide likelihood is "Likely," the current risk is "High," and the consequence of a landslide is "Catastrophic." *Id.* For the Lower Grider Creek watershed, the current landslide likelihood is

---

[8]   The fires had some positive effects for coho too, such as accelerating recruitment of downed wood into streams. AR F-1330. The fires may also help reconfigure bars and banks within the stream channel, and provide a surface for new riparian vegetation. AR F-1333.

[9]   Upper Grider Creek and Lower Grider Creek combine to include 12.3 miles of critical habitat for coho, 12.2 of which are within the project area. AR F-1312. Walker Creek includes 4.2 miles of critical habitat for coho, 4 of which are within the project area. *Id.*

"Almost Certain," the current risk is "Very High," and the consequence of a landslide is, again, "Catastrophic." *Id*. The BiOp notes that "random events" such as landslides and slope failures have "become an increased and significant factor in the extinction process" for SONCC coho, because there are so few returning adults in many streams. AR F-1305-06. And yet instead of properly examining the relationship between the specific project activities most likely to exacerbate the risks of slides and slope failures in the Walker and Grider Creeks watersheds, where coho spawn and rear and would be affected by these events, the BiOp improperly and simply lumps together project activities across *all* watersheds, and ultimately concludes that project effects are "minor" compared to the effects from the 2014 fires. AR F-1345-46.

This conclusion cannot logically follow from the BiOp findings vis-a-vis the watersheds that matter as to the *project's* effects on coho. In *Wild Fish Conservancy v. Salazar*, the Ninth Circuit examined a BiOp for dam operation and noted that given the acknowledged precarious status of the bull trout population at issue, the BiOp's conclusion that maintaining and operating the dams "would [not] be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery" of these fish was arbitrary and capricious because the facts simply did not support the conclusion made. *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 526-27 (9th Cir. 2010) (ruling that the BiOp failed to "consider the immediate and long-term effects of the action and articulate a rational connection between the facts found and the conclusions made") (internal quotes omitted).

The same is true here. Walker Creek watershed is "important for non-natal rearing of juvenile coho salmon, and to a lesser extent spawning and rearing of natal fish," AR F-1315, and almost all of it is critical habitat for SONCC coho. AR F-1312. It provides habitat for the Upper Klamath coho population, which is at "high risk of extinction." AR F-1313. The current landslide likelihood in the watershed is "Almost Certain," the current risk is "Very High," and the consequence of a landslide is "Catastrophic." AR F-1408. The likelihood of a landslide or slope failure will be increased where temporary road activities and/or new landing construction occur. AR F-1345. And yet precisely those activities are authorized as a part of the Walker Creek timber sale: under it, bulldozers would regrade 1.83 miles of temporary roads in the watershed,

and the sale requires construction of a least four new helicopter landing sites, AR F-1395, each of which can be up to *two acres* in size. AR A-418. And yet the BiOp does not reconcile these facts with its no jeopardy conclusion. AR F-1358-59.

Lower Grider Creek, too, is "important for non-natal rearing of juvenile coho salmon, and to a lesser extent spawning and rearing of natal fish," AR F-1315, and is critical habitat for coho. AR F-1312. It provides habitat for the same coho population, which is at "high risk of extinction." AR F-1313. The landslide likelihood in the Lower Grider Creek watershed is "Almost Certain," the risk is "Very High," and the consequence of a landslide is "Catastrophic." AR F-1408. The likelihood of landslides or slope failure will be increased where temporary roads and/or new landing construction occur. AR F-1345. And yet the project includes construction of *thirteen* new helicopter landing sites of up to two acres each in the area, to join the seven that already exist. AR F-1406. It also includes construction of temporary roads. *Id*.

These watersheds are essentially sacrifice zones under the Westside Project. But the BiOp dismisses them, because NMFS "expects *long-term* benefits to the population's size from reforestation and legacy site treatments that improve baseline conditions." AR F-1359 (emphasis added). This presumption is completely unfounded, as these mitigation measures are unlikely to ever be implemented, as explained in the next section. Regardless, NMFS cannot discount the more *immediate* harm to the Upper Klamath coho population on the basis that the project threatens to make conditions only somewhat worse in the short-term. In *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv*., the Ninth Circuit rejected NMFS's attempt to discount the prospect of jeopardy to salmon and steelhead trout when it tried to weigh whether proposed activities made things "'appreciably' worse than baseline conditions." *Id*., 524 F.3d 917, 930 (9th Cir. 2008). The Ninth Circuit ruled that such an approach is illegal because "a listed species could be gradually destroyed, so long as each step on the path to destruction is sufficiently modest. This type of slow slide into oblivion is one of the very ills the ESA seeks to prevent." *Id*. Instead, "even where baseline conditions already jeopardize a species, an agency may not take action that deepens the jeopardy by causing additional harm." *Id*. Here, even though the 2014 fires made

some areas more prone to landslides, NMFS improperly discounts that the project would expose coho to further loss or injury in watersheds that provide critical habitat. 5 U.S.C. § 706(2)(A).

### 2.   Project Mitigation is Uncertain, Speculative, and Unenforceable.

"[A] wildlife agency may rely on mitigation or conservation measures" as a basis to determine that an action will result in "no jeopardy." *Klamath-Siskiyou Wildlands*, 99 F. Supp. 3d at 1055. "Such measures, however, must involve 'specific and binding plans' as well as 'a clear, definite commitment of resources for future improvements." *Id*. (citing *Nat'l Wildlife*, 524 F.3d at 935-36). "Mitigation measures supporting a biological opinion's no-jeopardy conclusion must be 'reasonably specific, certain to occur, and capable of implementation; they must be subject to deadlines or otherwise-enforceable obligations; and most important, they must address the threats to the species in a way that satisfied the jeopardy and adverse modification standards." *Id*. (quotation omitted).

Here, NMFS relied on uncertain and discretionary "reforestation"[10] measures and "legacy site treatments"[11] to make its no jeopardy conclusion. *See* AR 1358-60. Yet the Forest Service does not have anywhere near sufficient funds to pay for these activities. AR A-910 ("timber receipts would fund 32.6% of the total restoration cost"). The economic analysis for the project indicates that at auction, the Forest Service would need to receive on average $173 per thousand board foot (mbf) of timber in order to generate 32% of the funds needed to complete this work. AR B-1412. Instead, the agency only received $11/mbf for the Slinkard sale, and $6.89/mbf for the Walker sale, the only two sales for which the Forest Service has received bids. Wheeler Dec., Ex. ¶17. At these literal "fire sale prices," the Forest Service will never pay for even 32% of the associated costs of the Project, much less 100% of its reforestation and legacy site treatments, which NMFS expressly relied upon for its no jeopardy conclusion. While "timber receipts are only one of several funding streams available to accomplish the landscape restoration treatments proposed in the Westside Fire Recovery Project," nothing in the AR  confirm that the agencies

---

[10]   "Reforestation" is defined as "site-preparation, planting, and release." AR F-1288.
[11]   "Legacy site treatments" are generally structural changes to sites within the project area designed to reduce the amount of sediment transported into streams, such as upgrading culverts under roads, building retaining walls, and removing fill. AR F-1289.

have secured all of the funding that they requires to obtain the ecological benefits they claim will result from post-fire salvage logging. AR A-837 ("Any of the slash disposal and reforestation work that cannot be accomplished with timber sale receipts will be accomplished with appropriated or other funds"); A-1265-66 ("Much of the proposed project will not happen if appropriated dollars are the only funding mechanism").

Indeed, almost all of the legacy site treatments (148 of 165) are located in one watershed, Elk Creek watershed, but there is no post-fire salvage logging proposed in this watershed as part of the Project. AR F-1289. Consequently, NMFS is "claiming credit" for an ecological "benefit" that will not occur not only because it is not funded, but also because the alleged beneficial activity won't even occur in the same location as salvage logging activities under the Project, where deleterious project effects will be realized. *Klamath-Siskiyou,* 99 F. Supp. 3d at 1052-53.

Moreover, NMFS never even required the Forest Service to ever actually complete the legacy site treatments, nor did mandate a timeline for doing so. When NMFS set "terms and conditions" to implement reasonable and prudent measures to avoid jeopardy where it could have made these treatments mandatory, it failed to do so, instead setting forth this provision: "Make concerted efforts to implement Legacy (sediment) site treatments as soon as possible, to help offset effects from Project implementation." AR F-1364. "Make concerted efforts" and "as soon as possible" are provisions that in no way ensure that the treatments are "certain to occur," which the law requires. *Klamath-Siskiyou*, 99 F. Supp. 3d at 1055. Consequently, it was legal error for NMFS to rely on legacy site treatment in order to reach its no jeopardy opinion.

In addition, the BiOp states that any legacy site treatments will not begin until 2019, and even then "may take up to two decades to complete." AR F-1287, F-1291. The amount of time it will take for any benefits of these treatments to be realized impermissibly far exceeds the three-year life span of coho; as such, the treatments may "not protect the coho, for there will be none to protect." *Pac. Coast Fed. of Fishermen's Assn. v. Bureau of Reclamation*, 426 F.3d 1082, 1094 (9th Cir. 2005) (finding that without an analysis of short-term impacts to coho, a project to be completed in ten years will not protect coho). Last, whether these treatments are ever completed at all by 2039 is also predicated on annual funding: the BiOp concedes that whether

they are implemented at all is contingent on "funding availability," AR F-1291, which as stated

previously, is at best a dubious assumption.

In sum, the needed mitigation to be accomplished via "reforestation" is already woefully

underfunded from timber sale receipts, and highly unlikely to be paid for through Congressional

appropriations, and the needed mitigation to be accomplished via "legacy site treatments" is not

required at all, and even if it were, it won't be completed for at least two decades. These

measures fail to support the no-jeopardy finding, and are arbitrary and capricious.

**V.     The Tribe is Entitled to a TRO.**

**A.     The Tribe Will Suffer Immediate and Irreparable Injury.**

The Tribe and the other Plaintiffs will suffer irreparable harm in two significant ways if

the Project is implemented. First, the unauthorized taking of coho salmon, a species that is

already threatened with extinction, is clearly irreparable. *Defenders of Wildlife v. Bernal*, 204

F.3d 920, 925 (9th Cir. 1999); *Earth Island Inst. v. Mosbacher*, 746 F. Supp. 964, 975 (N.D. Cal.

1990), *aff'd*, 929 F.2d 1449 (9th Cir. 1991) ("for those species now threatened with extinction,

the harm may be irreparable in the most extreme sense of that overused term"); *Forest Conserv.*

*Council v. Rosboro Lumber Co.*, 50 F.3d 781, 785 (9th Cir. 1995); *Ctr. for Biological Diversity*

*v. Fish & Wildlife Serv.*, No. C-08-1278 EMC, 2011 WL 6813200, at *4 (N.D. Cal. Dec. 28,

2011) ("[a]lthough Defendants argue that harm to the species as a whole is required, Ninth

Circuit case law does not support this proposition"); *Nat'l Wildlife Fed'n v. Burlington N.R.R.*,

23 F.3d 1508, 1512 n.8 (9th Cir. 1994).

Second, the loss of mature and old-growth forest habitat, which the Tribe and its

members use and enjoy, and which, by definition, cannot grow back within their lifetimes, is

irreparable. *Cottrell,* 632 F.3d at 1135 (post-fire logging causes "actual and irreparable injury" to

environmental plaintiffs' ability to view, experience, and utilize forested areas in their natural

state, even when other areas nearby would remain unlogged); *Portland Audubon Soc'y v. Lujan*,

795 F. Supp. 1489, 1509 (D. Or. 1992); *Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1057 (9th

Cir. 1994) ("timber sales constitute per se irreversible and irretrievable commitments of

resources" under the ESA).

The Tribe and other Plaintiffs have demonstrated a real interest in the health and recovery of post-fire environments, listed species including coho and spotted owls, and intact ecosystems recovering from natural disturbance. *See* First Declarations of Leaf Hillman, Joshua Saxon, Brittany Souza, Toz Soto, Bill Tripp, Luke Ruediger, George Sexton, Jay Lininger, and Carol Dyer, filed herewith. In particular, the Karuk Tribe is uniquely tied to the land as they have occupied this land since the beginning of time. *See* First Dec. of Joshua Saxon ¶¶ 6, 11; First Dec. of Leaf Hillman ¶ 34. Having originated from the land, the Tribe is spiritually tied to it, such that the spiritual health of the Tribe is intimately connected to the ecological health of the area. First Dec. of Leaf Hillman ¶¶3, 34; First Dec. of Joshua Saxon ¶ 11; First Dec. of Brittany Souza ¶¶ 6-8. Furthermore, the Tribe has a spiritual duty to properly tend and manage the land, as first delivered by the spirit people and handed down over generations. First Dec. of Brittany Souza ¶¶ 10, 11. To that end, the Karuk have funded natural resource specialists to help restore salmon and beneficial fire to the landscape. *See* First Dec. of Toz Soto and Bill Tripp. Salvage logging will harm the Tribe by degrading habitat and harming wildlife critical to Karuk ceremonies, First Dec. of Leaf Hillman ¶ 3; First Dec. of Joshua Saxon ¶ 10, degrading spiritually important areas, First Dec. of Joshua Saxon ¶ 12, as well as promoting management practices inconsistent with the spiritual direction passed down by ancestors. First Dec. of Brittany Souza ¶24; First Dec. of Joshua Saxon ¶ 12.

The Karuk Tribe has historically relied upon the land to provide food, fuel, housing, and clothing, but federal mismanagement, including fire management, has harmed the Karuk by removing or degrading traditional and/or cultural plants and wildlife; the Westside Project will continue this history of mismanagement. *See* First Dec. of Leaf Hillman. Today, the Tribe is still reliant on the Klamath River and the Klamath National Forest to produce culturally important plants and wildlife species. For instance, the Karuk gather mushrooms in areas proposed for salvage logging; the Westside Project harms the ability to gather mushrooms. First Dec. of Brittany Souza ¶¶ 22, 23. Areas used by Karuk members for acorn harvest, a historically important foodstuff for the Karuk, are likewise slated for harvest and harvest will harm the Karuk by interfering with gathering and potentially removing acorn producing trees. First Dec.

of Brittany Souza ¶ 21. The Westside Project places greater value on economically important tree species over culturally important species by promoting conifer plantations over native hardwoods, such as acorn producing trees. First Dec. of Leaf Hillman ¶ 22.

Turning specifically to coho salmon, salmon have long been an important foodstuff for the Karuk. First Dec. of Leaf Hillman ¶ 4. Declines in salmon have harmed the Karuk by reducing the amount of catchable fish, which negatively affects the health of the people. First Dec. of Leaf Hillman ¶¶ 15, 19. Salvage logging will further harm the Karuk by increasing sediment pollution and the risk of landslides. First Dec. of Toz Soto ¶¶ 21-32.

The Karuk have a deep-seated interest in returning fire to the landscape. To forward that interest, in the NEPA process, the Karuk Tribe developed the "Karuk Alternative" which was designed to help restore both fire to the landscape while protecting rural river communities. First Dec. of Bill Tripp ¶¶ 17, 23, 24. The Westside Project, in contrast to the Karuk Alternative, promotes fire exclusion. First Dec. of Bill Tripp ¶ 24; First Dec. of Toz Soto ¶ 25.

While the Karuk have lived in the project area since time immemorial, non- live in the area nonetheless and call the area home. *See* First Dec. of Ruediger ¶ 17; First Dec. of Carol Dyer ¶ 2. Plaintiffs also use, recreate in, and otherwise enjoy the specific areas that are being logged and destroyed through project implementation, and plan to continue to do so in the future. Dec. of Luke Ruediger ¶¶ 13-17; First Dec. of George Sexton ¶¶ 11, 13-22, 25-39; First Dec. of Jay Lininger ¶ 7; First Dec. of Carol Dyer ¶¶ 8-10, 17-19, 24. Plaintiffs enjoy these areas in their natural state because they are natural and beautiful, even if affected by a wildfire, and will not be able to use and enjoy these areas if and when they are logged or their enjoyment of these areas will be diminished. *See* First Dec. of Luke Ruediger ¶¶ 4, 14, 15, 16; First Dec. of Carol Dyer ¶¶ 22, 23; First Dec. of Jay Lininger ¶ 7-17; First Dec. of George Sexton ¶¶ 13-19. Moreover, there are no "substitute" areas where Plaintiffs may go to have the same experience; in *Cottrell*, the court specifically rejected the federal agency's argument that having other places to go, even places nearby and in a similar natural state, would prevent plaintiffs from suffering irreparable harm from the loss of a particular forested area from a specific logging project. 632 F.3d at 1135.

**B.     The Balance of Equities Tips Strongly in Favor of the Tribe.**

Having demonstrated they will suffer irreparable without injunctive relief, the Tribe and other Plaintiffs need not demonstrate that the balance of the equities tips in its favor because in the context of coho and spotted owls listed under the ESA, "Congress has decided that under the ESA, the balance of hardships always tips sharply in favor of the endangered or threatened species." *Wash. Toxics Coal.*, 413 F.3d at 1035; *Nat'l Wildlife Fed'n*, 422 F.3d at 793 ("[i]n cases involving the ESA, Congress removed from the courts their traditional equitable discretion in injunction proceedings of balancing the parties' competing interests"). As discussed previously, courts have continued to follow the Supreme Court's ruling in *TVA* in ESA cases after the decision in *Winter*. *See Nw. Envtl. Def. Ctr. v. U.S. Army Corps of Eng'rs*, 817 F. Supp. 2d 1290, 1302 (D. Or. 2011) (applying standard).

Even if other factors are considered here, they weigh heavily in favor of a TRO. Notably, the injunction sought is only temporary in nature, and does not preclude the Project being implemented this season if, after the Court considers the parties' briefs on a temporary relief basis, denies the Tribe's motion. Additionally, the Tribe's requested relief is narrowly tailored: they seek to enjoin only the clear cut salvage unit logging for economic recovery, and do not seek to enjoin hazard tree removal along roads traveled by the public or roads needed for future fire management.

Plaintiffs will suffer many varied, unique, and deeply felt injuries, should salvage logging commence. These injuries are perhaps most acute for the Karuk as the project will leave a scar on the spiritual, cultural, and subsistence use of their ancestral homelands. In contrast, preserving the status quo will not deeply injure Defendants.

Moreover, coho salmon in the planning area are highly vulnerable and local populations are near extinction. The public has a significant interest in preventing species from going extinct, and any economic harm to the Defendants does not outweigh the irreparable harm to a threatened species and its habitat. *Tenn. Valley Auth.*, 437 U.S. at 194 ("Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities"). On the other hand, economic harm to the timber

sale purchasers or Forest Service does not weigh against an injunction as temporary economic harm cannot outweigh harm that is permanent and irreparable (i.e., timber harvest). *Los Angeles Mem. Coliseum v. National Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980); *Cottrell,* 632 F.3d at 1138-39 ("the public interest in preserving nature and avoiding irreparable environmental injury outweighs economic concerns in cases where plaintiffs were likely to succeed on the merits of their underlying claim"). Regardless, preserving the status quo is also unlikely to greatly affect the local economy as the overall supply of logs in the local economy would remain unchanged. First Dec. of Ernest Niemi ¶¶8a, 8c, 10-13 24-27. Furthermore, the economics costs of the ecological impacts of the proposed logging likely would exceed the timber-related benefits. *Id.* at ¶8b, 14-23.

Once cut, the forests at issue here will not be suitable habitat for nearly a century, if not longer. Similarly, once extirpated from the area, coho salmon will be slow to, if ever, repopulate the area. Given Congress' clear direction in cases involving threatened species, and how vulnerable spotted owls are, and given how destructive and irreparable the logging authorized by the Forest Service is, the public interest and the balance of equities clearly favor an injunction.

### C.  The Court Should Not Require a Bond in this Case.

It is established that in public interest environmental cases such as this one, the Court should be reluctant to require the plaintiffs to post bonds, because of the potential chilling effect on litigation to protect the environment and the public interest. *See*, *e.g.*, *California ex rel. Van de Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319 (9th Cir. 1985) (no bond).

### CONCLUSION.

For the forgoing reasons, the court should GRANT Plaintiffs' motion for a TRO.


Date:  April 18, 2016.                    Respectfully submitted,

                                          /s/ Tom Wheeler
                                          Tom Wheeler (CA Bar #304191)
                                          Environmental Protection Information Center
                                          145 G Street #A
                                          Arcata, California 95521
                                          tom@wildcalifornia.org
                                          Ph: (707) 822-7711

Fax: (707) 822-7712

*Counsel for Plaintiff Environmental Protection Information Center*

Susan Jane M. Brown, *pro hac vice*
Western Environmental Law Center
4107 N.E. Couch St.
Portland, Oregon 97232
brown@westernlaw.org
Ph.: (503) 914-1323
Fax: (541) 485-2457

Peter M.K. Frost, *pro hac vice*
Western Environmental Law Center
1216 Lincoln Street
Eugene, Oregon 97401
frost@westernlaw.org
Ph: (541) 359-3238
Fax: (541) 485-2457

*Counsel for Plaintiff Karuk Tribe, Klamath Riverkeeper, Klamath-Siskiyou Wildlands Center, Center Biological Diversity*